UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────

TIMOTHY A. VAIL,

                            Plaintiff,

    v.                                            9:19-CV-0034
                                                     (GLS/ML)

JOSEPH F. BELLNIER, JOSEPH T. SMITH, LOUIS
PINGOTTI, E. BELL, GERALD GARDNER, AMBER
TOMLIN, SCOTT A. KELLY, and JAMES A.
O'GORMAN,

                            Defendants.

─────────────────────────────────

APPEARANCES:

TIMOTHY A. VAIL
89-C-1513
Plaintiff, *pro se*
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403

HON. LETITIA JAMES                 ERIK BOULE PINSONNAULT, ESQ.
Attorney General for the          Assistant Attorney General
State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**MIROSLAV LOVRIC**
**United States Magistrate Judge**

### REPORT-RECOMMENDATION AND ORDER[1]

Currently before the Court, in this civil rights action filed by Timothy Vail ("Plaintiff")

─────────────────────

[1]       This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

against Joseph F. Bellnier ("Bellnier"), Joseph T. Smith ("Smith"), Louis Pingotti ("Pingotti"), E. Bell ("Bell"), Gerald Gardner ("Gardner"), Amber Tomlin ("Tomlin"), Scott A. Kelly ("Kelly"), and James A. O'Gorman ("O'Gorman") ("Defendants"), is Defendants' motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. No. 28. For the reasons set forth below, I recommend that Defendants' motion be granted in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Procedural History

On August 17, 2018, Plaintiff commenced this action by filing a Complaint together with a motion for leave to proceed in forma pauperis ("IFP") in the United States District Court for the Western District of New York ("Western District"). Dkt. No. 1 ("Compl.") and Dkt. No. 2 ("IFP Application"). Plaintiff asserted claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Shawangunk Correctional Facility ("Shawangunk C.F.") and Attica Correctional Facility ("Attica C.F."). *See generally*, Compl.

On December 4, 2018, District Judge Charles J. Siragusa granted Plaintiff's IFP application, dismissed Plaintiff's causes of action arising out of his incarceration in Attica C.F., and severed and transferred the remaining causes of action to this District. Dkt. No. 4.

In a Decision and Order issued on March 8, 2019 (the "March Order"), the Court directed defendants Smith, Bell, Pingotti, Tomlin, Gardner, Bellnier, O'Gorman, and Kelly to respond to the Fourteenth Amendment due process claims and defendants Smith, Pingotti, Tomlin, Gardner, Bellnier, O'Gorman, and Kelly to respond to the First Amendment retaliation claims. Dkt. No. 6. On October 30, 2019, in lieu of an answer, Defendants filed a motion to dismiss

the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Dkt. No. 28.  Plaintiff has opposed the

motion (Dkt. No. 30) and Defendants submitted a reply (Dkt. No. 31).

## B. Facts[2]

On July 7, 2003, Plaintiff escaped from DOCCS custody while he was confined at Elmira

Correctional Facility.  Compl. at ¶ 23.  After he was captured, Plaintiff was sentenced to ten

years in the Special Housing Unit ("SHU").  *Id*.  In May 2010, Plaintiff was transferred to the

Close Supervision Unit ("CSU") at Shawangunk C.F.[3]  *Id*. at ¶¶ 25, 27; Dkt. No. 1 at 65.[4]

On March 3, 2014, defendants Superintendent Smith and Deputy Superintendent of

Security Bell informed Plaintiff that he was recommended for Administrative Segregation

("Ad. Seg.").  Compl. at ¶ 39.  The same day, Plaintiff received a written Ad. Seg.

recommendation, authorized by Smith.  *Id*. at ¶ 40; Dkt. No. 1 at 94-95.  The

recommendation was based upon the following: (1) Plaintiff's 1989 conviction for 2nd Degree

murder, 2nd degree burglary, 1st degree rape, 1st degree robbery, and 3rd degree burglary[5]; (2)

Plaintiff's 2003 escape; and (3) Plaintiff's disciplinary history since being placed in the SHU

including nine misbehavior reports for incidents such as unauthorized behavior and legal

work, smuggling, explosives, altering items, harassment, threats, creating a disturbance, and

contraband.  Compl. at ¶ 41; Dkt. No. 1 at 94-95.  Following a hearing on March 7, 2014,

---

[2]        The relevant facts are recited from the Complaint and exhibits annexed to the Complaint (Dkt. No. 1) and, for the purposes of this motion, are taken as true.

[3]        The CSU is not a SHU, it is a housing block for inmates who are considered a high-risk to the safety and security of the facility.  Dkt. No. 1 at 65-66.

[4]        Throughout this Report-Recommendation, references to page numbers in items that appear on the docket refer to the pagination of the header numbers generated by CM/ECF, not to the page numbers used by the parties in the individual documents.

[5]        During the burglary of an office, Plaintiff raped and murdered a woman who was eight months pregnant.  Dkt. No. 1 at 94.

which Plaintiff refused to attend, Plaintiff was officially confined in Ad. Seg.  Compl. at ¶ 42;

Dkt. No. 1-2 at 2-4.  Plaintiff was advised that his Ad. Seg. status would be routinely reviewed

by "facility and central office[.]" Compl. at ¶ 43.

On May 2, 2014, Bell informed Plaintiff that he initiated the first review of Plaintiff's Ad.

Seg. status.  Compl. at ¶ 44.  On May 5, 2014, Plaintiff submitted a statement to the

"Administrative Segregation Review Committee" and asked to be released from Ad. Seg. or,

in the alternative, for "incentives/privileges."  *Id*. at ¶ 45; Dkt. No. 1-1 at 9-10.  A facility

committee comprised of three members issued a summary report and noted:

> Overall attitude with SHU staff acceptable, however needs
> close supervision due to poor disciplinary history, including a
> sophisticated escape.

Dkt. No. 1-1 at 15-16.  The committee recommended retaining Plaintiff in Ad. Seg. deeming

him "a high escape risk."  *Id*.

Because Plaintiff was designated "central office review," the review was forwarded to the

central office for a final determination.  Compl. at ¶ 44.  The Central Office committee issued

a summary report and discussed the facts surrounding Plaintiff's underlying conviction:

> Inmate Timothy Vail (DIN 89C1513) is serving an aggregate
> sentence of 52 ½ years to life in prison.  The facts underlying
> the original crime are that on December 29, 1988, while
> burglarizing a business office, inmate Vail encountered a
> woman who was eight months pregnant.  Inmate Vail brutally
> raped and killed the woman causing the death of her unborn
> child as well.

Dkt. No. 1-1 at 15-16.  The committee also spoke to Plaintiff's poor disciplinary history

including thirty disciplinary reports and detailed Plaintiff's successful escape plan.  *Id*.  The

committee noted that Plaintiff adjusted to Ad. Seg. and interacted appropriately with staff,

while maintaining hygiene and order in his cell.  *Id*.  The committee also considered a

4

statement from Plaintiff and took his request to be placed in the Pilot Incentive Program, under advisement. *Id*. at 9-10, 15-16. Accounting for all of the aforementioned factors, the committee recommended that Plaintiff remain in Ad. Seg. concluding:

> By nature of his vicious underlying crimes, his disciplinary history and his escape from Elmira Correctional Facility, it is clear that placement in any less restrictive setting would pose a danger to the safety and good order of any facility.

Dkt. No. 1-1 at 16.

On June 18, 2014, defendant Deputy Commissioner O'Gorman concluded that Plaintiff's presence in general population posed a serious threat to the security of any facility, and continued Ad. Seg. status. Dkt. No. 1-1 at 15.

From May 2014 until July 2016, Plaintiff's Ad. Seg. status was reviewed every sixty days.[6] Compl. at ¶ 48; Dkt. No. 1-1 at 31-34; Dkt. No. 1-2 at 33-35, 44-45, 50-51, 55-56, 61-63, 64-72; Dkt. No. 3. Plaintiff provided statements in response to reviews, which the committees acknowledged during the May 2014, September 2014, April 2015, October 2015, and January 2016 reviews. Dkt. No. 1-1 at 18-22; Dkt. No. 1-2 at 4, 52-54, 57. Upon the completion of the reviews, after receiving recommendations from the facility committees and Central Office committees, O'Gorman or defendant Deputy Commissioner Bellnier issued decisions extending Plaintiff's Ad. Seg. confinement. *Id*. Defendants provided Plaintiff with copies of the reviews.[7] Compl. at ¶¶ 58, 67, 69, 82, 90, 93, 94, 99, 100, 101, 102.

During his confinement in Ad. Seg. in the SHU at Shawangunk C.F., Plaintiff spoke with

---

[6]    Plaintiff annexed copies of eleven reviews as exhibits to his Complaint. In the Complaint, Plaintiff discussed reviews that occurred in July 2015 and January 2015, but those reviews were not included in the submission. *See generally*, Compl.

[7]    Plaintiff received a copy of the September 2014 review after he filed a Freedom of Information Law ("FOIL") request. Compl. at ¶ 67, 69; Dkt. No. 1-1 at 28, 31-34.

several staff members including defendants Supervising Offender Rehabilitation Coordinator Tomlin, Deputy Superintendent of Security Pingotti, and Smith about the review process. Compl. at ¶¶ 50-57, 60-66, 86, 111.  Plaintiff claimed that he was not being provided with notice of pending hearings or copies of reviews in a timely manner.  *Id*.  Plaintiff asked Defendants to identify members of the review committees and provide information regarding "what behavior or set of circumstances the Defendants would require in order to release [him] from Ad. Seg." *Id.*

During his confinement, Plaintiff also wrote several letters to Smith, Commissioner Anthony Annucci[8], and Pingotti claiming that he did not receive copies of the reviews in a timely manner and that the reviews were not being held every sixty days, as mandated by DOCCS regulations.  Compl. at ¶¶ 49, 63, 71-74, 77, 78, 80, 106-111; Dkt. No. 1-1 at 12, 26; Dkt. No. 1-2 at 4, 8, 25, 83-84.

On June 10, 2015[9], a reporter from the *New York Daily News* visited Plaintiff to interview him about his prison escape in light of a recent escape by inmates in DOCCS' custody at Clinton Correctional Facility in June 2015.  Compl. at ¶ 85; Dkt. No. 1-2 at 36-37.

In August 2017, Plaintiff was transferred to Attica C.F.  Compl. at ¶ 118.

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or

---

[8]        Annucci is not a defendant herein.

[9]        In the Complaint, Plaintiff states that the interview occurred in July 2015.  This appears to be a typographical error.  Upon review of the exhibits annexed to the Complaint, the date of the interview was June 10, 2015.  *See* Dkt. No. 1-2 at 44, 46.

Case 9:19-cv-00034-GLS-ML   Document 32   Filed 06/15/20   Page 7 of 33

(2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty*., 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on de novo review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).[10]

The Supreme Court has explained that such fair notice has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F.Supp.2d at 212, n.18 (citing Supreme

---

[10]    *Accord*, *Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

7

Court cases); *Rusyniak v. Gensini*, 629 F.Supp.2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 Moore's Federal Practice § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F.Supp.2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the conceivability of an actionable claim, the Court clarified, the "fair notice" standard turns on the plausibility of an actionable claim. *Id*. at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id*. at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (citations omitted).

However, "in a pro se case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F.Supp.2d 289, 295 (N.D.N.Y. 2007) (Sharpe, M.J.) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is

9

obligated to " 'make reasonable allowances to protect pro se litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

In considering a motion to dismiss under Rule 12(b)(6), the court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). In this instance, the Complaint includes 140 pages of exhibits including: (i) records related to the decision to confine Plaintiff to Ad. Seg.; (ii) correspondence between Plaintiff and Shawangunk C.F. staff; (iii) correspondence between Plaintiff and the *New York Daily News* reporter; (iv) eleven Ad. Seg. reviews conducted between May 2014 and July 2016; and (v) grievance records. The Court may review and consider the aforementioned documents, in considering the motion to dismiss. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

### III. DISCUSSION[11]

Defendants move to dismiss the Complaint, in its entirety arguing: (1) Bell was not personally involved in any alleged constitutional violations; (2) the Fourteenth Amendment procedural due process and First Amendment retaliation claims are insufficiently plead, and

---

[11]    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to Plaintiff.

(3) Defendants are entitled to qualified immunity with respect to the retaliation claims. *See generally,* Dkt. No. 28-1 at 11-21.

## A. Personal Involvement

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen*., 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

Plaintiff alleges that Bell was responsible for preparing "the initial portion of the periodic Ad. Seg. reviews as part of the 3 person committee on the facility level[.]" Compl. at ¶ 9. Plaintiff accuses Bell of stating that "Central Office wasn't ever going to release him from the SHU[.]" *Id*. at ¶ 48. Defendants admit that Bell "had a hand in preparing the initial portion of the Ad Seg reviews as part of the three person Facility Committee" and that his name appears on one of the Ad Seg reviews attached to the Complaint. *See* Dkt. No. 28-1 at 23. Despite those facts, Defendants move to dismiss the due process claims against Bell arguing that Bell was transferred from Shawangunk C.F. in July 2014 and therefore, was only involved in the Ad. Seg. review process for four months of the three and a half relevant years. *See id.* Defendants also claim that Bell was not the "final decision maker." *See id.*

11

Defendants seemingly argue that Bell's involvement was too remote to state relief under section 1983 and therefore, dismissal is warranted. At this stage of the litigation, the Court does not agree. Based upon Defendants' admissions and construing the Complaint broadly, the Court concludes that Plaintiff has plausibly alleged that Bell was personally involved in the alleged due process violations, to survive a motion to dismiss.

Accordingly, the undersigned recommends that Defendants' motion, on this ground, be denied.

## B. Due Process

To establish a procedural due process claim pursuant to 42 U.S.C. § 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest[12]

To establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995*); Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658. "The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free

---

[12]    Defendants do not seek dismissal of Plaintiff's due process claims on this ground. *See generally,* Dkt. No. 28-1. Instead, Defendants' arguments are focused on whether Plaintiff was afforded sufficient process. *See id.*

from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). Administrative segregation inmates live in the SHU and are subject to most of the disciplinary restrictions of SHU inmates. *See Edmonson v. Coughlin*, 21 F.Supp.2d 242, 248–49 (W.D.N.Y.1998) (footnote omitted). Thus, inmates have a liberty interest in remaining free from administrative segregation. *See Giano v. Kelly*, 869 F.Supp. 143, 148 (W.D.N.Y. 1994).

"[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48–49 (2d Cir. 1997)). The Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*."). Generally, inmates who spend an extended period of time in administrative segregation have a more significant liberty interest for due process analysis. *Ford v. Deacon*, No. 9:16-CV- 01001 (MAD/TWD), 2018 WL 5729352, at *23 (N.D.N.Y. Aug. 27, 2018) (citation omitted) *aff'd*, 793 Fed. App'x 13 (2d Cir. 2019).

Here, Plaintiff claims that he was confined in Ad. Seg. in the SHU at Shawangunk C.F. from March 7, 2014 until July 2017. *See generally*, Compl. At this juncture, Plaintiff has sufficiently plead that he was deprived of a liberty interest by way of his confinement to survive Defendants' motion to dismiss.

## 2. Procedural Due Process

"[Administrative segregation] is appropriate when necessary to incapacitate an inmate who 'represents a security threat' or to 'complet[e] . . . an investigation into misconduct charges.' " *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (quoting *Hewitt v. Helms*, 459 U.S. 460, 474-77 (1983)). "Before confining an inmate in Ad Seg, prison officials must provide 'some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to [Ad Seg],' although not necessarily a full hearing." *Id.* (citing *Hewitt*, 459 U.S. at 476, *accord Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001)). Because "administrative segregation may not be used as a pretext for indefinite confinement of an inmate[,]" after an inmate is placed in Ad. Seg., "prison officials must engage in some sort of periodic review of the confinement[.]" *Giano*, 869 F.Supp. at 149 (citation omitted). These periodic reviews are "flexible and may be based on 'a wide range of administrative considerations,' including but not limited to observations of the inmate in [administrative segregation], 'general knowledge of prison conditions,' misconduct charges, ongoing tensions in the prison, and any ongoing investigations." *Proctor,* 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 476-477).

At the time Plaintiff was confined in Ad. Seg., New York State regulations required that "[a]n inmate in administrative segregation status shall have such status reviewed every 60 days" by a "three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff." 7 NYCRR § 301.4(d); *see* Compl. at ¶ 19.[13] The procedure was as follows:

---

[13]    In July 2017, the regulation was amended to require a review every thirty days. Dkt. No. 1-2 at 85.

(1) A three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff shall examine the inmate's institutional record and prepare and submit to the superintendent or designee a report setting forth the following:

(i) reasons why the inmate was initially determined to be appropriate for administrative segregation;

(ii) information on the inmate's subsequent behavior and attitude; and

(iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

7 NYCRR § 301.4(d)(1).

Pursuant to the regulations, upon receipt of the report and any written statement from the inmate, the superintendent was charged with making a determination to retain or release the inmate. 7 NYCRR § 301.4(d)(2). In cases, such as Plaintiff's, where the Deputy Commissioner for Correctional Facilities notified the superintendent that the inmate should receive central office review, the superintendent was required to refer the report and inmate statement to a three-member central office committee. *Id*. at § 301(d)(3); *see* Compl. at ¶¶ 20-21. The committee would complete a review and forward the paperwork, along with its recommendation, to the deputy commissioner for correctional facilities to make the determination to retain the inmate in or release the inmate from administrative segregation. *Id*.

While prison officials are afforded "wide-ranging deference" in regard to Ad. Seg. review procedures, the periodic reviews must be "meaningful." *Walker v. Bellnier*, No. 9:17-CV-1008 (GTS/CFH), 2019 WL 2479612, at *6 (N.D.N.Y. Jan. 15, 2019) (quoting *Proctor v. Kelly*, No. 9:05-CV-0692 (GTS/GJD), 2008 WL 5243925, at *25 (N.D.N.Y. Dec. 16,

15

2008)).  In this Circuit, a meaningful periodic review must fulfill a three-step process:

> First, the reviewing prison officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified. It is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows. Review with a pre-ordained outcome is tantamount to no review at all.
>
> Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available.
>
> Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term.  SHU confinement that began for proper Ad Seg purposes may not morph into confinement that persists for improper purposes.

*Proctor*, 846 F.3d at 610-11 (internal citations omitted).

Here, Plaintiff was placed in Ad. Seg. in March 2014 based upon the nature of his crime, his successful escape, and his poor disciplinary history while confined in the SHU including, but not limited to, violations related to explosives, contraband, smuggling, creating a disturbance, and threats/harassment.  *See* Dkt. No. 1 at 94-95.  After his initial confinement, Plaintiff's Ad. Seg. status was reviewed.

According to the facts alleged in the Complaint and the exhibits annexed thereto, from May 2014 until January 2017, Defendants conducted sixteen 60-day reviews of Plaintiff's Ad. Seg. status.  Plaintiff alleges that Bell, Pingotti, Tomlin, and Gardner were members of the facility committee tasked with initiating the periodic reviews.  *See* Compl. at ¶¶ 11-14. Plaintiff also claims that Kelly was a member of the Central Office committee and that

16

Bellnier and O'Gorman were the "ultimate authority" on every periodic review. *See id.* Plaintiff alleges that the periodic reviews were not meaningful and that Defendants violated his due process rights in the following respects: (1) he did not receive notice of periodic reviews, guidelines for release from Ad. Seg., the identity of committee members, the opportunity to submit timely statements to the committees, copies of the reviews in a timely manner; (2) the reviews were repetitive, performed in a rote or perfunctory manner, and contain "boiler plate language"; (3) Defendants failed to adhere to DOCCS regulations related to periodic reviews; and (4) Defendants "condemned" him to "indefinite confinement" in Ad. Seg.[14]  *See* Compl. at ¶¶ 127-131; Dkt. No. 30 at 3.  Defendants argue that the periodic reviews complied with the *Proctor* criteria.  *See* Dkt. No. 28-1 at 11-17.

### a.  Prior Notice, Guidance, and Opportunity to Submit Statements

There is no support in *Hewitt* for Plaintiff's allegation that due process requires he receive notice of periodic reviews.  *Edmonson v. Coughlin*, 21 F.Supp.2d 242, 252-254 (W.D.N.Y. 1998); *see also Giano*, 869 F.Supp. at 150 ("Under federal and state law, an inmate is not required to have the dates of his reviews[.]").  Moreover, *"Hewitt* specifically held that there need be no requirement that [administrative segregation] inmates submit evidence or statements to the committee." *Id*.   Similarly, the tenets of due process do not mandate that an inmate is entitled to the decisions of reviews, the identity of reviewers, or information regarding what is needed to be released from administrative confinement.  *Giano*, 869 F.Supp. at 150; *see Payne v. Friel*, 919 F.Supp.2d 1185, 1208 (D. Utah 2013) (holding that

---

[14]       Plaintiff does not challenge the recommendation or initial decision to confine him to Ad. Seg. *See* Dkt. No. 6 at 6, n.5.

while additional procedural guidelines would be beneficial, the current policy, which did not explain how the reviews were conducted, the role of the reviewers, or require copies of reviews to be provided to inmates, did not violate due process). However, the Court may consider these issues and specifically, whether the inmate had involvement in the review process, as a factor in determining whether the reviews were meaningful.

In this case, based upon the facts as presently plead, Plaintiff cannot reasonably claim that he was not involved in the periodic review process. Assuming the facts in the Complaint to be true, on May 2, 2014 Bell advised Plaintiff that the periodic reviews had commenced. *See* Compl. at ¶¶ 44, 48. On May 5, 2015, Plaintiff submitted a statement for consideration by the review committees. *Id.* at ¶ 45. Plaintiff continued to submit statements to the committees which were specifically referenced in the May 2014, September 2014, March 2015, May 2015, November 2015, and March 2016 reviews. *See* Compl at ¶¶ 45, 59; Dkt. No. 1-1 at 9-10,15-16, 18-22, 31-34; Dkt. No. 1-2 at 30-32, 33-35, 50-51, 52-54, 57, 64-66; Dkt. No. 3.

Additionally, from July 2014 through January 2017, Plaintiff had several conversations with staff members including Bell, Tomlin, Smith, and Pingotti related to the review process. *See id*. at ¶¶ 51-57, 60-62, 64-66, 86, 111. During those conversations, Plaintiff told Defendants that he was not receiving notice of the reviews and sought to obtain the identity of the members of the review committees and guidance related to behavior or circumstances required for release from Ad. Seg. *See id.* While he was confined in Ad. Seg., Plaintiff also sent numerous letters to Smith, Pingotti, and other officials, with his objections and concerns regarding the review process. *See* Compl. at ¶¶ 49, 63, 71-74, 77, 78, 80, 106-111; Dkt. No.

1-1 at 12, 13, 26; Dkt. No. 1-2 at 25, 27-28 31-34, 36-38, 83-84. While Plaintiff alleges, in his opposition to the motion, that he was unable to submit statements on his behalf in a timely manner, preceding reviews, *see* Dkt. No. 30 at 3, the facts alleged in the Complaint and exhibits annexed to the pleading, contradict this argument.

As presently plead, the Complaint plausibly suggests that Plaintiff was involved in the periodic review process. These facts weigh in favor of finding that Defendants' reviews were meaningful. *See Edmonson*, 21 F.Supp.2d at 252-254 (reasoning that because the plaintiff and defendant engaged in "regular conversations" regarding reviews, the plaintiff could have relayed information and statements to the defendant).

**b. Reviews**

Plaintiff argues that the periodic reviews were not meaningful because the reports contain information and language that the committees "cop[ied] and past[ed] [. . .] from one review to the next." *See* Compl. at ¶ 131. Although Plaintiff correctly points out that, in each review, Defendants cited to Plaintiff's underlying conviction, his successful escape, and poor disciplinary history as justification for retaining him in Ad. Seg., this fact alone does not support the conclusion that the reviews were perfunctory or rote.

"The fact that [subsequent] reports contain similar language does not necessarily mean that the reviews were a 'sham.'" *Zimmerman v. Seyfert*, No. 9:03-CV-1389 (TJM), 2007 WL 2080517, at *20 (N.D.N.Y. July 19, 2007) (rejecting the plaintiff's claim that continued reliance upon his attempted escape as a basis for continued confinement rendered the review a "sham"); *see also Edmonson*, 21 F.Supp.2d at 252-54 (holding that a decision to continue to confine an inmate in ad. seg. could be based upon the same set of facts, with

identical language, as the decision to originally confine the inmate). Indeed, the fact that a prisoner is an "escape risk" is a relevant factor to be considered throughout Ad. Seg. placement. *See Zimmerman*, 2007 WL 2080517, at *20 (emphasis supplied) (citing *Tellier v. Scott*, No. 94 Civ. 3459, 2004 WL 224499 (S.D.N.Y. Feb. 5, 2004)).

Continuing with an analysis of the *Proctor* factors, the Court notes that Defendants' decisions to extend Plaintiff's Ad. Seg. confinement were not based solely upon Plaintiff's crime, his escape, and his disciplinary record. Defendants also considered new "relevant evidence" including disciplinary violations that occurred after Plaintiff was placed in Ad. Seg. In the March 2015 and May 2015 reviews, the committees discussed two recent Tier III misbehavior reports charging Plaintiff with altering a document sent to the superintendent and threatening a staff member. Dkt. No. 1-2 at 34; Dkt. No. 3. In the January 2016 review, Defendants referred to Plaintiff's third misbehavior report, issued in December 2015, and subsequent guilty determination, for harassing a nurse. Dkt. No. 1-2 at 61-63.

In addition to new disciplinary violations, Defendants also considered Plaintiff's interview with the *New York Daily News* reporter, as a basis for finding that continued Ad. Seg. confinement was warranted. Dkt. No. 1-2 at 44-45, 64-66, 70-72.

The aforementioned facts weigh in favor of finding that the periodic reviews were meaningful. *See Edmonson*, 21 F.Supp.2d at 252-54 (citing *Giano*, 869 F.Supp. at 149-151) (while determining if a review was meaningful, the court should consider whether the committee accepted information from other sources); *see also H'Shaka v. Bellnier*, No. 9:17-CV-0108 (GTS/ATB), 2018 WL 798884, at *9 (N.D.N.Y. Feb. 9, 2018) (denying the plaintiff's motion for preliminary injunctive relief because although the sixty day reports may contain

20

similar language, it was also clear that DOCCS officials considered current behaviors when continuing to recommend Ad. Seg.), *aff'd sub nom. H'Shaka v. O'Gorman*, 758 Fed. App'x 196 (2d Cir. 2019).

### c. 7 NYCRR § 301.4(d)

Plaintiff argues that his due process rights were violated because the reviews did not comport with the requirements set forth in 7 NYCRR § 301.4.  *See* Dkt. No. 30 at 3-6. Specifically, Plaintiff contends that Defendants violated DOCCS regulations because they initiated reviews before the prior reviews were completed and failed to conduct more than two reviews from July 2016 until July 2018.  *See id*.

First, to the extent that Plaintiff argues that Defendants violated § 301.4, "a violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Burroughs v. Petrone*, 138 F.Supp.3d 182, 219 (N.D.N.Y. 2015) (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (internal quotation marks omitted)); *see also Parson v. Miller*, 9:16-CV-0167 (DNH/CFH), 2018 WL 4233810, at *9 (N.D.N.Y. May 25, 2018) ("[A]n inadvertent denial of a period review does not give rise to a due process claim."); *see also Ford v. Deacon*, 793 Fed. App'x 13, 17–18 (2d Cir. 2019) (finding no due process violation where the plaintiff alleged that his first review was not conducted until 105 days after his initial placement, in violation of DOCCS regulations).  Even assuming reviews were not completed every sixty days, the facts, as presently plead, suggest that the reviews were held "periodically" and thus, comported with the minimal requirements of due process. *See H'Shaka v. O'Gorman*, No. 9:17-CV-0108 (GTS/ATB), 2020 WL 1188075, at *12 (N.D.N.Y. Mar. 12, 2020) (reasoning that *Hewitt* and *Proctor* only require that reviews be

21

conducted "periodically").

Second, Plaintiff's claim that Defendants conducted only two reviews in a two year period is conclusory and not supported by the facts alleged in the Complaint or the exhibits annexed thereto. Of relevance to this action, Plaintiff asserts that Defendants did not conduct the adequate number of reviews from July 2016 through August 2017.[15] However, in letters to Commissioner Annucci, Superintendent LaManna[16], and Pingotti in December 2016 and January 2017, Plaintiff complained that the reviews were not being completed "near 60 days." Dkt. No. 1-2 at 80-82, 84. Plaintiff did not claim that the reviews were not being conducted. *Id*. Moreover, in February 2017, Plaintiff filed a grievance claiming that "[t]he reviews that were initiated by the facility review committee [i]n Sept and Nov. 2016, as well as Jan 2017, are still pending as of the date of this grievance. These are only a few examples of the most recent reviews that have been completed[.]" *Id*. at 89.

Accordingly, the facts suggest that Defendants "continuously engaged in 'some sort of periodic review' of [Plaintiff's] administrative confinement as required by *Hewitt*." *Fleetwood v. Brown*, 947 F.2d 944 (6th Cir. 1991). The Complaint and exhibits do not suggest that Defendants "deliberately denied" Plaintiff any review "in an attempt to punish him[.]" *Parson*, 2018 WL 4233810, at *9.

### d. Pretextual

As to the final *Proctor* factor, construing the Complaint liberally, Plaintiff also alleges that

---

[15]    Plaintiff claims that only two reviews were conducted between July 2016 and July 2018, however, of relevance herein is the time period between July 2016 and August 2017. Plaintiff was transferred out of Shawnagunk C.F. in August 2017. *See* Dkt. No. 1-2 at 94.

[16]    LaManna is not named as a defendant herein.

22

his confinement was pretextual and not based upon realistic safety and security concerns. Plaintiff alleges that Bell told Plaintiff "it didn't matter what he wrote because Central Office wasn't ever going to release him from the SHU[.]"  Compl. at ¶ 48. Plaintiff also claims that shortly after his meeting with the New York Daily News reporter, Smith told Plaintiff that "by visiting and answering questions from the reporter [. . .], it did little to enhance any chance of his efforts to get out of Ad. Seg." *Id.* at ¶ 86.  Plaintiff also asserts that before his transfer out of Shawangunk C.F., Kelly "flatly stated that they were not going to be letting Plaintiff out of Ad. Seg." *Id.* at ¶¶ 117-118.

Even assuming Defendants made these statements, it does not suggest that Plaintiff was not afforded due process.  Defendants contend, and Plaintiff does not dispute, that Plaintiff was transferred to Mid-State Correctional Facility in June 2019 and is no longer on Ad. Seg. status.  *See* Dkt. No. 28-1 at 9.  Plaintiff's release from Ad. Seg. weighs in favor of finding that his confinement was not "pretextual" or intended to be "indefinite." *See Edmonson*, 21 F.Supp.2d 242, 252-254 (W.D.N.Y. 1998) (the plaintiff's eventual release from administrative segregation, without judicial intervention, suggests that his reviews were meaningful); *see Smith v. Anderson*, No. 10-CV-1869, 2011 WL 1043367, at *7 (D.Colo. Jan. 24, 2011) (holding that the plaintiff's release from administrative segregation "cuts against concluding" that his confinement was indefinite).

Plaintiff's "pretext" claim is further weakened by the fact that he was considered for, and briefly participated in, the Pilot Incentive Program.  Dkt. No. 1-1 at 16.  In the September 2014 report, the committee noted that Plaintiff was "being allowed one phone call presently as part of the Pilot Incentive Program, even though ordinarily an inmate must wait for a year

before being offered any participation in that program." *See* Dkt. No. 1-1 at 34.  While his telephone privileges were subsequently rescinded due to "pending discipline," *see* Dkt. No. 1-2 at 35, Defendants indicated that Plaintiff would be reviewed for the program "when he has a period of time free of disciplinary problems" and "following more post adjustment time." *See* Dkt. No. 1-2 at 45, 56, 51; Dkt. No. 3.  In the Marcy 2016 review, Defendants noted that, during a recent visit with his wife, photographs were taken, and Plaintiff was provided with copies.  *See* Dkt. No. 1-2 at 65.  Additionally, in July 2016 review, Defendants noted that Plaintiff was receiving monthly telephone calls.  *See id.* at 70.

The fact that Plaintiff was considered, and, indeed, received privileges while in Ad. Seg., does not suggest that his confinement was being used "as punishment rather than for legitimate reasons of safety."  *See H'Shaka*, 2018 WL 798884, at *9 (reasoning that the plaintiff "ignores the fact that he was permitted to participate in the Pilot Incentive Program, through which he received various greater privileges").

Because Plaintiff has not sufficiently plead that the periodic reviews failed to comply with the requirements of due process or that the decision to continue to confine Plaintiff in Ad. Seg. was not based upon the interest in maintaining the prison safety and security, the undersigned recommends granting Defendants' motion, on this ground.

## C.  Retaliation

A cognizable retaliation claim pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment.  *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where

24

the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws.").  As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a prima facie claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).  If a plaintiff satisfactorily alleges that an improper motive played a substantial part in the defendant's action, the defendant must show that it would have taken "exactly the same action absent the improper motive."  *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

Plaintiff alleges that Defendants continued his Ad. Seg. confinement in retaliation for visiting with the reporter in June 2015.  As to the first prong of the retaliation analysis, Plaintiff argues that he has the First Amendment right to speak with the media.  *See id.* at ¶ 86. Plaintiff further asserts that he suffered adverse action because he remained confined in Ad.

Seg.  As to the third factor, Plaintiff claims that a causal connection exists because Defendants referred to his June 2015 visit from a reporter in the July 2015 review. Defendants do not dispute that Plaintiff sufficiently alleged that he suffered an adverse action.  However, Defendants argue that Plaintiff failed to plead that he engaged in protected activity or a causal connection between the protected activity and the adverse action.  *See* Dkt. No. 28-1 at 19.

### 1.  Protected Conduct

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  "[T]he First Amendment is subject to severe curtailment when its protections are inconsistent with the limitations inherent in incarceration, especially those limitations necessary for the safety and security of the prison environment." *Rodriguez v. Phillips*, 66 F.3d 470, 478 (2d Cir. 1995).  "In *Pell v. Procunier*, [. . .] the Supreme Court expressly held that the institutional considerations of prison systems, particularly public safety and the need to control the movement of prisoners, justified some limitation on prisoners' speech, and therefore alternative forms of communication were sufficient to satisfy a prisoner's First Amendment right to communicate with the media."  *Am. Acad. of Religion v. Chertoff*, 463 F.Supp.2d 400, 410 (S.D.N.Y. 2006); *see also Gottesfeld v. Anderson*, No. 18 CIV. 10836, 2020 WL 1082590, at *11 (S.D.N.Y. Mar. 6, 2020) ("A prison official who bars media interviews of an inmate does not violate the inmate's First Amendment rights where other channels of communication are available.").  "Inmates, as individuals, do not have a personal constitutional right to communicate with the press.

26

However, once the right to a press interview is granted, the content of the communication is subject to the protection of the first amendment.  The extent of this protection is, itself, subject to the legitimate policies of the corrections system."  *Martinez v. Oswald*, 425 F.Supp. 112, 114-15 (W.D.N.Y. 1977) (citing *Pell*, 417 U.S. at 817).

Defendants move to dismiss the retaliation claim arguing that Plaintiff's statements to the reporter about his escape and the Clinton escape were not protected by the First Amendment.  *See* Dkt. No. 28-1 at 19-20.  In this regard, Defendants' rely upon the published *New York Daily News* article and reason that, Plaintiff "offered tips and support for currently escaped inmates; wistful remarks about how exciting his brief escape had been; and an assertion that, if not for his injury, his escape from prison would have been successful and the authorities would never find him."  *See id.* at 8, 20.  Defendants submit that Plaintiff's statements did not concern his treatment by staff or prison conditions and "did not implicate any constitutional or statutorily [sic] rights and, thus, do not amount to protected speech[.]"  *See id.* at 19-20.

As discussed *supra*, on a motion to dismiss, the Court may rely upon facts alleged in the complaint, documents attached to it or incorporated by reference, or documents that are "integral" to the complaint.  *Weiss v. Incorp. Village of Sag Harbor*, 762 F.Supp.2d 560, 567 (E.D.N.Y. 2011).  The Court may consider "documents or information contained in defendant's motion papers, if plaintiff has knowledge or possession of the material and relied on it in framing the complaint[.]  *Id.*  The Court may also take notice of matters of public record, *see Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998), including "the full contents of the published articles referenced in the complaint[.]"  *Bell Atl. Corp. v.*

27

*Twombly*, 550 U.S. 544, 568 n.13 (2007).

In this instance, the published article was not annexed as an exhibit to the Complaint or Defendants' motion.  Throughout the Complaint, Plaintiff refers to his meeting with the reporter, but he does not quote the article or his statements to the reporter.  Indeed, the Complaint does not include the title of the article or the date that it was published.  Based upon these omissions, coupled with the fact that Plaintiff did not annex a copy of the article within the 140 pages of exhibits submitted with the Complaint, the Court cannot conclude that Plaintiff relied upon the article when he drafted the Complaint.  Rather, Plaintiff's retaliation claims are based upon the fact that he met and spoke with the reporter, not upon the statements made to the reporter or the substance of the published article.  Accordingly, the Court will not consider the article, or the statements allegedly contained therein, to resolve disputed issues on Defendants' motion.  *See Condit v. Dunne*, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004) (holding that the Court would consider the fact that the articles were published for the limited purpose of establishing a "media frenzy," but would not consider the substance of the articles).

Other than paraphrasing Plaintiff's alleged statements, Defendants do not offer any other arguments in support of the conclusion that Plaintiff did not engage in protected conduct.  Defendants do not address the issue of whether any alternate channels of communication with the media were available to Plaintiff and Defendants do not contend that the interview interfered with legitimate penological objectives of the corrections system.  *See Murphy v. Lockhart*, 826 F.Supp.2d 1016, 1030–31 (E.D. Mich. 2011), *amended in part* (Oct. 14, 2011) (finding that the plaintiff sufficiently plead facts suggesting that his statements to Esquire were protected by the First Amendment).  Moreover, as discussed in *Murphy*, if Defendants

28

were concerned about the safety and security of the facility, "defendants certainly could have restricted press access to the plaintiff concerning his attempted prison escape." *Id*. (citing *Pell*, 417 U.S. at 834–35).

Drawing all reasonable inferences in Plaintiff's favor, the Court finds that he has sufficiently plead that his meeting with the reporter constituted protected conduct under the First Amendment. Accordingly, the undersigned recommends denying Defendants' motion, on this ground.

### 2. Causal Connection

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Roseboro v. Gillespie*, 719 F.Supp.2d 353, 366 (S.D.N.Y. 2011); *see also Tuitt v. Chase*, 11-CV-0776, 2013 WL 877439, at *7 (N.D.N.Y. Jan. 30, 2013) (Dancks, M.J.) (factors relevant to a consideration of causal connection "include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation"). The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 Fed. App'x 43, 46 (2d Cir. 2017); *see also Thomas v. Waugh*, 13-CV-0321, 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015)

29

(D'Agostino, J. adopting Report-Recommendation on de novo review) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)) ("temporal proximity alone is insufficient to establish an inference of retaliation.").

Here, in addition to temporal proximity connecting Plaintiff's June 2015 interview with the July 2015 review, Smith's statements provide circumstantial evidence of causation.  On July 10, 2015, Smith stated that "by visiting and answering questions from the reporter [. . .], it did little to enhance any chance of his efforts to get out of Ad. Seg. status." *See* Compl. at ¶ 86. Smith confirmed the conversation in a memorandum dated July 14, 2015.  Dkt. No. 1-2 at 38.

Accordingly, the undersigned concludes that Plaintiff has sufficiently plead the third prong of the retaliation claim.

### 3.  Same Action Absent Improper Motive

To the extent that Defendants claim that they would have taken the same action against Plaintiff absent the protected conduct, at this stage of the litigation, the Court is unable, on a motion to dismiss, to resolve such factual disputes.  *See Carl v. Dirie*, No. 9:09-CV-0724 (GTS/RFT), 2010 WL 3338566, at *6 (N.D.N.Y. March 29, 2010) (denying the defendant's motion to dismiss retaliation claim due to factual issues surrounding whether the defendants would have taken the same actions in the absence of retaliatory motives).

Accordingly, the undersigned recommends that Defendants' motion to dismiss Plaintiff's retaliation claims be denied.

### D.  Qualified Immunity

In the alternative, Defendants argue that they are entitled to qualified immunity as to Plaintiff's retaliation claim.  *See* Dkt. No. 28-1 at 21-22.  Defendants submit that it was not

clear to a reasonable officer that Plaintiff's remarks to a news reporter about his escape and the Clinton escape would constitute constitutionally protected speech. *See id.* at 22.

"While qualified immunity is ordinarily an affirmative defense asserted in an answer, a defendant can properly raise a qualified immunity defense in a pre-answer 12(b)(6) motion to dismiss." *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist*., No. 18-CV-01790, 2020 WL 2131771, at *9 (S.D.N.Y. May 4, 2020) (citing, *inter alia, McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Aiken v. Nixon*, 236 F.Supp.2d 211, 229-30 (N.D.N.Y. 2002) (J. McAvoy), *aff'd* 80 Fed. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991); *Magnotti v. Kuntz*, 918 F.2d 364, 367(2d Cir. 1990) (internal citation omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation. *Aiken*, 236 F.Supp.2d at 230. "To determine whether a right was clearly established, [courts] 'generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation.' " *Bacon v. Phelps*, __ F.3d. __, 2020 WL 3039101, at *7

(2d Cir. 2020) (citation omitted).   According to the Second Circuit's reasoning in *Bacon*, the issue is whether, at the time Plaintiff met with the *New York Daily News* reporter, precedent put prison officials on notice that they could not punish him for his statements to the reporter. *See id.*

At the relevant time, it was clearly established law that retaliation for protected conduct violated the First Amendment.   Based upon the facts asserted in the Complaint, which the Court accepts as true, the "fact-intensive nature of the qualified immunity analysis," and the cursory argument presented by Defendants, the undersigned concludes that dismissal, on this ground, is not warranted at this time.   *See LTTR Home Care, LLC v. City of Mount Vernon Indus. Dev. Agency,* No. 17-CV-9885, 2019 WL 4274375, at *11 (S.D.N.Y. Sept. 10, 2019)*; Washington v. Gonyea,* 538 Fed. Appx. 23, 27 (2d Cir. 2013) ("where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law") (quoting *Locurto v. Safir,* 264 F.3d 154, 169 (2d Cir. 2001)); *see also Taylor v. Vermont Dep't of Educ*., 313 F.3d 768, 793 (2d Cir. 2002) (the issue of whether a defendant is entitled to qualified immunity is not appropriately resolved at the motion to dismiss stage).

Accordingly, the undersigned recommends denying Defendants' motion, on this ground.

## IV.  CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED** that Defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 28) be **GRANTED** as to Plaintiff's Fourteenth Amendment due process

claims against Smith, Bell, Pingotti, Tomlin, Gardner, Bellnier, O'Gorman, and Kelly; and it is further

**RECOMMENDED** that Defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 28) be **DENIED** as to (1) Bell's personal involvement; (2) Plaintiff's First Amendment retaliation claims; and (3) qualified immunity; and it is further;

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[17] days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


DATED:   June 15, 2020


Miroslav Lovric
U.S. Magistrate Judge

---

[17]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(c).