UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TIMOTHY A. VAIL,

                          Plaintiff,

v.
                                                                9:19-CV-0034
JAMES O'GORMAN; JOSEPH BELLNIER;                                 (GLS/ML)
JOSEPH SMITH; LOUIS PINGOTTI;
GERALD GARDNER; ANITA TOMLIN,
formerly known as Amber Tomlin; and
SCOTT KELLY,

                          Defendants.
_____

APPEARANCES:                                      OF COUNSEL:

TIMOTHY A. VAIL
  Plaintiff, *Pro Se*
Sullivan Correctional Facility
Post Office Box 116
Fallsburg, New York 12733

LETITIA A. JAMES                                  ERIK B. PINSONNAULT, ESQ.
Attorney General for the State of New York        Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224


MIROSLAV LOVRIC, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for a Report and Recommendation by the Honorable Gary L. Sharpe, Senior United States District Judge.  Currently before the Court, in this civil rights action filed by Timothy A. Vail ("Plaintiff") against James O'Gorman, Joseph Bellnier, Joseph Smith, Louis Pingotti, Gerald Gardner, Anita Tomlin, and Scott Kelly (collectively "Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 53.)  For the reasons set forth below, I recommend that Defendants' motion be granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint asserts one claim of retaliation pursuant to the First Amendment and 42 U.S.C. § 1983, against Defendants.  (*See generally* Dkt. Nos. 1, 32, 40.)  The Court's Report and Recommendation dated June 15, 2020, thoroughly outlines Plaintiff's allegations and claims.  (Dkt. No. 32 at 3-6.)

### B.    Procedural History

On August 26, 2021, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 53.)  Plaintiff's response was due by September 16, 2021.  (Dkt. No. 54.)  On September 7, 2021, Plaintiff filed a motion requesting the appointment of counsel. (Dkt. No. 55.)  On September 7, 2021, the undersigned denied Plaintiff's motion for appointment of counsel and *sua sponte* granted an extension of time for Plaintiff to file a response to the pending motion for summary judgment until October 1, 2021.  (Dkt. No. 56.)  On October 18, 2021, the Court again *sua sponte* extended the deadline for Plaintiff to file a response to Defendants' motion for summary judgment, until November 1, 2021.  (Dkt. No. 57.)  To date, Plaintiff has not filed a response.  (*See generally* docket sheet.)

C.      **Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff.  (Dkt. No. 53, Attach. 11 [Defs.' Statement of Material Facts].)

1.      Before entering DOCCS's custody in 1989, Plaintiff had been convicted of two felonies and at least one misdemeanor.[1]

2.      In 1989, Plaintiff was convicted of five crimes—including first degree rape and second degree murder—and sentenced to serve 52 ½ years to life in prison.

3.      On July 7, 2003, Plaintiff escaped from Elmira Correctional Facility ("Elmira") with another inmate using tools stolen from a vocational shop.

4.      On March 3, 2014, Plaintiff was recommended for Administrative Segregation ("Ad Seg") status.[2]

5.      After a hearing, Plaintiff was placed in Ad Seg status.

6.      Once an inmate is placed in Ad Seg, pursuant to 7 N.Y.C.R.R. § 301.4(d), there is a three-step process to determine the appropriateness of continued Ad Seg.[3]

---

[1]     Defendants' statement of material fact indicates that Plaintiff was previously convicted of two felonies and one misdemeanor.  (Dkt. No. 53, Attach. 11 at ¶ 1.)  However, the declaration of Defendant O'Gorman states that Plaintiff was previously convicted of two felonies and two misdemeanors.  (Dkt. No. 53, Attach. 10 at ¶ 18.)  In addition, Defendant O'Gorman's declaration cites to the "Vail Classification Analysis" in support of this asserted fact, which also states that before he was received by DOCCS, Plaintiff had two felony and two misdemeanor convictions.  (Dkt. No. 53, Attach. 10 at 11.)

[2]     DOCCS inmates are placed in Ad Seg when, after a hearing, it is determined that they pose such a "threat to the safety and security of the [prison] facility" that they are not suitable for general population.  7 N.Y.C.R.R. § 301.4.

[3]     The Court notes that Defendants cited paragraph 10 of Defendant O'Gorman's declaration in support of this asserted fact.  (Dkt. No. 53, Attach. 11 at ¶ 6.)  However, paragraph

7.     First, a "Facility Committee" prepares and submits to the superintendent of the prison facility a report recommending whether to continue the Ad Seg status and setting forth the following: "(i) reasons why the individual was initially determined to be appropriate for [Ad Seg]; (ii) information on the individual's subsequent behavior and attitude; and (iii) any other factors that . . . may favor retaining the individual in or releasing the individual from [Ad Seg]."[4]

8.     Second, the superintendent forwards the Facility Committee's report and any written response provided by the inmate to a "Central Office Committee" located at DOCCS Central Office.  The Central Office Committee then reviews the Facility Committee's report, develops its own recommendation, and forwards the paperwork to the DOCCS Deputy Commissioner of Correctional Facilities.

9.     Third, the Deputy Commissioner of Correctional Facilities reviews the two review committees' recommendations, and the inmate's written statement when applicable, and decides whether to continue the inmate in Ad Seg.

10.     After his placement in Ad Seg in March 2014, while he was confined at Shawangunk Correctional Facility ("Shawangunk"), Plaintiff received periodic reviews of his Ad Seg designation.

11.     In 2015, a reporter from the New York Daily News, Rich Schapiro, visited Plaintiff to interview him.

12.     Based on this interview, the New York Daily News published an article on or about July 10, 2015.

---

11—not paragraph 10—of Defendant O'Gorman's declaration supports this fact.  (*Compare* Dkt. No. 53, Attach. 10 at ¶ 10, *with* Dkt. No. 53, Attach. 10 at ¶ 11.)

[4]     *See supra* note 3.

13.     In the article there were several remarks and quotes attributed to Plaintiff.

14.     Plaintiff was quoted in the article as saying, *inter alia*, (a) "I hope they [Matt and Sweat[5]] stay out of sight and don't commit any new crimes"; (b) the adrenaline from escaping prison is "unbelievable"; and (c) "[i]f I didn't get hurt [during my escape], I would've never been seen again."

15.     In Plaintiff's Ad Seg review dated September 8, 2015, following the publication of this newspaper article, the Central Office Committee provided a one-page summary of factors underlying their recommendation that Plaintiff remain in Ad Seg, which included the fact that Plaintiff "has repeatedly voiced his propensity for and desire to escape; as evidenced by his published comments in support of the inmates involved in the recent Clinton prison escape."

16.     The Central Office Committee also took note of Plaintiff's 1989 conviction, the details of his 2003 escape, his thirty-two misbehavior reports, and his recently improved behavior, clean cell, and appropriate personal hygiene.

17.     Plaintiff's next Ad Seg review, dated November 18, 2015, noted, "[i]n a recent interview with a journalist Vail gave statements regarding the June 2015 Clinton incident which indicated his support for the escapees, his own ongoing interest in the subject and a sense of his own capability."  In addition, the review stated that Plaintiff "earned 90 days SHU and loss of privileges for threatening a" correctional officer in March 2015.

18.     Plaintiff's next Ad Seg review, dated January 12, 2016, considered Plaintiff's most recent inmate misbehavior report (dated December 4, 2015), and that Plaintiff "has also

---

[5]     Matt and Sweat were inmates at the Clinton Correctional Facility who escaped using similar tactics as Plaintiff used during his escape and were on the run at the time of the New York Daily News article.

voiced his favorable views regarding escape from State prison as evidenced by his comments in support of the two inmates who escaped last year from the Clinton Correctional Facility."

19.     In an Ad Seg review dated March 15, 2016, the Central Office Committee again considered Plaintiff's disciplinary history.

20.     In an Ad Seg review dated May 23, 2016, the reviewing officials noted, *inter alia*, that Plaintiff "exhibited some impulse control when he [wa]s having a bad day."

21.     In July 2017, Plaintiff was transferred out of Shawangunk.

22.     At his deposition, Plaintiff testified that Defendant Gardner is "not part of the First Amendment claim . . . he has to do more with that he was signing my reviews on the facility level . . . and never actually being a participant in . . . any review committees they had. He was just signing it, just signing off."

23.     At his deposition, after being asked about his retaliation claim, Plaintiff testified that Defendant Tomlin "never went to a meeting . . . She would just be called and told to sign. She would come down and sign off on it" and she did not actually participate in the process.

24.     DOCCS Inmate Grievance Program ("IGP") consists of a three-step grievance and appeal procedure, with specified timeframes.  First, an inmate must file a written grievance with the IGP clerk at his or her correctional facility within 21 calendar days of the alleged occurrence.  The grievance is then reviewed by the inmate grievance review committee ("IGRC").  Second, if an inmate is dissatisfied with the IGRC's decision, he or she may appeal to the facility superintendent.  To do so, the inmate must "complete and sign the appeal section of the IGRC response form . . . and submit it to the grievance clerk within seven calendar days after receipt of the IGRC's written response."  At the third and final step, an inmate may appeal an adverse superintendent's decision to the Central Office Review Committee ("CORC").

25.    Plaintiff was interviewed by the reporter from the New York Daily News in or around early July 2015, and the article was published on or about July 10, 2015.

26.    Before the article was published, Plaintiff filed and appealed numerous grievances using the IGP.

27.    After the article was published, Plaintiff filed and appealed grievance SHG-29750-15, entitled "Not Provided Review Copies," in which, he complained about documentation related to his Ad Seg reviews.

28.    Grievance SHG-29750-15 does not mention anything about the article or a retaliation claim.

### D.    Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1.    Defendants' Memorandum of Law

Generally, in support of their motion for summary judgment, Defendants assert the following four arguments: (1) Plaintiff's retaliation claim fails as a matter of law; (2) Defendants are entitled to qualified immunity with respect to the retaliation claim; (3) Plaintiff failed to exhaust his administrative remedies; and (4) several Defendants should be dismissed for lack of personal involvement.  (*See generally* Dkt. No. 53, Attach. 1 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff's fond memories about prison escape do not constitute protected speech because they do not relate to (a) his treatment by correctional staff or other prison conditions, (b) his legal rights, (c) a petition for redress of grievances, and (d) a matter of concern to the general public or the inmate population at large.  (*Id*. at 14-16.)  In addition, Defendants argue that Plaintiff has not shown that the alleged protected conduct was a "substantial motivating factor" in Defendants' decision to continue Plaintiff's Ad Seg status.  (*Id.* at 16-17.)  Defendants argue that, instead, Plaintiff's remarks about his own escape were one

factor among many, and were relevant to DOCCS officials' consideration of whether (a) Plaintiff remained an escape risk, and (b) if released back to the general population, he would follow facility rules. (*Id.*) Moreover, Defendants argue that even assuming, *arguendo*, that Plaintiff met his *prima facie* burden, Defendants have shown that they would have continued Plaintiff's Ad Seg status in the absence of any protected conduct because Plaintiff's remarks to the New York Daily News reporter were merely one factor, among many, that were considered including Plaintiff's criminal history, prison disciplinary history, escape in 2003, and recent behavior. (*Id.* at 17.)

Second, Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's retaliation claim. (*Id.* at 18-20.) Defendants argue that the law is unsettled as to whether oral speech by inmates constitutes protected speech, whether Plaintiff's remarks about prison escapes constituted protected speech, and whether Defendants acted appropriately under the circumstances including the Ad Seg regulations and the framework set forth in *Proctor v. LeClaire*, 846 F.3d 597 (2d Cir. 2017). (*Id.*)

Third, Defendants argue that Plaintiff failed to exhaust his administrative remedies because he did not file a grievance or appeal any grievance addressing the retaliation claim asserted in this action. (Dkt. No. 53, Attach. 1 at 20-22.) In addition, Defendants argue that Plaintiff's time in which to exhaust has expired, and thus, it is proper for the Court to dismiss the Complaint with prejudice because any attempt to exhaust now would be futile. (*Id.*)

Fourth, Defendants argue that Defendants O'Gorman, Gardner, Tomlin, and Smith should be dismissed for lack of personal involvement. (*Id.* at 22-23.) More specifically, Defendants argue that Defendant O'Gorman should be dismissed because (a) he was not a member of the facility or Central Office review committee, (b) he did not act as a final reviewer

on any of the relevant Ad Seg reviews, and (c) he did not participate in (or sign) any of

Plaintiff's reviews after the date of the newspaper article until after Plaintiff left Shawangunk.

(*Id*.)  In addition, Defendants argue that Defendant Gardner should be dismissed based on

Plaintiff's own admission that Defendant Gardner is not part of the First Amendment retaliation

claim.  (*Id*.)  Moreover, Defendants argue that Defendant Tomlin should be dismissed based on

Plaintiff's testimony that she "never went to a meeting" and did not actually participate in the

process.  (*Id*.)  Finally, Defendants argue that Defendant Smith should be dismissed because (a)

he was not a member of the facility or Central Office review committee, (b) he did not sign—nor

was he supposed to sign—the Ad Seg reviews, and (c) his alleged remark to Plaintiff—that

Plaintiff's comments in the news interview did not help Plaintiff's chances of being released

from Ad Seg—and that he spoke regularly with Defendant Pingotti, are insufficient to

demonstrate personal involvement.  (*Id*.)

### 2.    Plaintiff's Opposition

To date, Plaintiff has failed to oppose Defendants' motion.  (*See generally* docket sheet.)

## II.    STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[6]  As for the materiality requirement, a dispute of fact is

---

[6]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[7] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[8] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[9]

---

[7]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[8]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[9]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[10]–even when the non-movant was proceeding *pro se*.[11]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[12] Stated another way, when a non-movant fails to oppose a legal argument

---

[10]    Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

[11]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[12]    *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v.*

asserted by a movant, the movant may succeed on the argument by showing that the argument

possesses facial merit, which has appropriately been characterized as a "modest" burden. *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested

therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009

WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

After carefully considering the matter, I recommend that Defendants' motion be granted

and Plaintiff's Complaint be dismissed.

### A.    Whether Plaintiff's Retaliation Claims Fail as a Matter of Law

The Second Circuit has "instructed district courts" to consider "'prisoner retaliation

claims with skepticism and particular care, because virtually any adverse action taken against a

prisoner by a prison official—even those otherwise not rising to the level of a constitutional

violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Dolan v.

Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.

2003)).  Retaliation claims "stated in wholly conclusory terms" are insufficient.  *Dolan*, 794 F.3d

at 295 (internal quotation marks and citations omitted).

To plead a First Amendment retaliation claim, an inmate must plausibly allege that: (1)

his or her speech or conduct was protected, (2) that the prison official engaged in action that was

---

*Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004)
(McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude
expert testimony as "a concession by plaintiff that the court should exclude [the expert's]
testimony" on that ground).

adverse to him or her, and (3) that the protected speech or conduct was causally connected to the adverse action. *Id.* at 294 (internal quotation marks and citation omitted).

While an individual is not stripped of all constitutional rights upon incarceration, an inmate's constitutional liberties are necessarily limited. "A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995)) (internal punctuation omitted); *accord Pell v. Procunier*, 417 U.S. 817, 822 (1974). Accordingly, while "[i]nmates clearly retain protections afforded by the First Amendment," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere," *Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality opinion). At bottom, "[t]he governing standard is one of reasonableness." *Shakur*, 391 F.3d at 113 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)) (internal punctuation omitted).

Assuming, without deciding, that Plaintiff's speech to the New York Daily News was "protected speech" within the meaning of a First Amendment retaliation claim, I still recommend that his retaliation claim be dismissed. Although the undersigned found, in the Order and Report-Recommendation dated June 15, 2020, that Plaintiff had sufficiently pleaded a causal connection between his protected speech and the adverse action, after reviewing the New York Daily News article, the Court revisits its prior conclusion.

Several recent district court cases in this Circuit have held that allegations that prison officials relied on social media posts to determine an inmate's status as a Security Risk Group ("SRG") member, do not satisfy the causal requirement for stating a valid First Amendment

retaliation claim.  *See Benway v. Aldi*, 19-CV-0208, 2020 WL 4433561 at *4 (D. Conn. July 31, 2020) (dismissing the plaintiff's First Amendment retaliation claims where he only alleged that the defendants "used the information from his social media posting as evidence to support his Security Risk Group designation" and thus did "not raise[] an inference that he was retaliated against on the basis of his speech"); *Martinez v. Payne*, 20-CV-0231, 2020 WL 3630422, at *4 (D. Conn. July 4, 2020) (holding that the plaintiff's "allegations show the defendants used his social media posts as evidence of his gang affiliation.  In the absence of an allegation that they sought to punish or retaliate against [him] simply for engaging in First Amendment-protected expression (or for the content of that expression apart from what it suggested about [the plaintiff's] gang affiliation), the complaint does not plausibly suggest a First Amendment retaliation claim."); *Wilson v. Santiago*, 19-CV-1807, 2020 WL 1989135, at *2-3 (D. Conn. Apr. 27, 2020) (holding that "an allegation that prison officials relied on social media posts for making a determination of a detainee's gang membership 'is not enough to satisfy the third element, a causal connection between the adverse action and the protected speech' as is required to state a valid First Amendment retaliation claim"); *Caves v. Payne*, 20-CV-0015, 2020 WL 1676916, at *4 (D. Conn. Apr. 6, 2020) (finding that the plaintiff failed to allege a causal connection where he "was designated an SRG member because he posted information determined to be gang-related and therefore indicative of gang membership. . . . The defendants' use of social media posts and [the plaintiff's] own statements therein, is no different than if [the plaintiff] announced upon his arrival at the facility that he was a gang member and the defendants used those statements to designate him to the SRG unit.").

Here, it is undoubtedly true that prison officials have a legitimate penological interest in ensuring the safety and security of the prison.  As set forth in *Caves*, "[t]he First Amendment . . .

does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Caves*, 2020 WL 1676916, at *4 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)); *see also United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (finding First Amendment challenge to admission of rap videos in criminal trial to be meritless because videos were used as evidence of defendant's participation in charged conspiracies and crimes). Plaintiff has not alleged facts suggesting that his statements to the New York Daily News were a substantial or motivating factor in any retaliatory conduct by Defendants. Plaintiff's allegations do not plausibly raise an inference that Defendants acted with retaliatory motivation "to punish him for [speaking with the press] or to deter him from doing so in the future." *Caves*, 2020 WL 1676916, at *4. Plaintiff's "allegations show only that . . . Defendants used the information from his [news interview] as evidence to support his" continued Ad Seg status. *Benway*, 2020 WL 4433561, at *6. Therefore, Plaintiff's Complaint has not raised an inference that he was retaliated against on the basis of his speech.

As a result, I find that his First Amendment retaliation claim is not plausible and recommend that it be dismissed.

In addition, to the extent that Plaintiff did plausibly allege a *prima facie* claim of retaliation, I find that Defendants have established that they would have continued Plaintiff's Ad Seg status even in the absence of any protected conduct.[13]

---

[13]    Defendants cite the Ad Seg review documents (Dkt. No. 53, Attach. 3 at 7-32), which were attached to the declaration of Assistant Attorney General Pinsonnault, in support of this contention. As set forth below in Part III.C. of this Report and Recommendation, Attorney Pinsonnault does not appear to have personal knowledge sufficient to authenticate these records. However, many of these records were also attached to the Complaint (Dkt. No. 1, Attach. 2) and there is other admissible evidence in the record to support the conclusion.

For example, Defendants Tomlin and Gardner declared under penalty of perjury that, "[e]ven if not for the June 2015 Daily News article, I would have recommended Vail remain in Ad Seg because of his original crime, his escape, and his disciplinary history." (Dkt. No. 53, Attach. 4 at ¶ 14; Dkt. No. 53, Attach. 6 at ¶ 13.) Defendant Kelly declared under penalty of perjury that, "[e]ven if not for the June 2015 Daily News article, I would have recommended that Vail remain in Ad Seg placement as this individual creates an unreasonable risk to the safety and security of staff and incarcerated individuals and the public at large requiring separation from the general population in order to ensure institutional security." (Dkt. No. 53, Attach. 7 at ¶ 11.) Defendant Smith declared under penalty of perjury that Plaintiff's "interview itself did not have any bearing on Vail's continued Ad Seg determination." (Dkt. No. 53, Attach. 8 at ¶ 11.) Defendant Bellnier declared under penalty of perjury that, "[e]ven if not for the June 2015 Daily News article, I would have accepted the recommendations that Vail remain in Ad Seg because of his original crime, his escape, and his disciplinary history." (Dkt. No. 53, Attach. 5 at ¶ 11.)

Moreover, the Ad Seg review documents reflect that Plaintiff's quotes in the New York Daily News interview were just one factor, among many, that were considered with respect to Plaintiff's continued Ad Seg status. (Dkt. No. 1, Attach. 2 at 33-38, 44-45, 50-56, 61-69; Dkt. No. 3.)

As a result, I recommend that, in the alternative, Plaintiff's retaliation claims be dismissed because Defendants have established that they would have taken the same action against Plaintiff absent the protected conduct.

**B.     Whether Defendants are Entitled to Qualified Immunity**

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords

government officials 'breathing room' to make reasonable—even if sometimes mistaken—

decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v.

Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and

'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v.

McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d

Cir. 2010)).

  "The doctrine of qualified immunity shields officials from civil liability so long as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal

quotations and citations omitted). The Court has discretion to determine the order in which it

will address the inquiries required when assessing the applicability of qualified immunity. *See

Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Pearson* 555 U.S. at 236).

  A right is clearly established if, "at the time of the challenged conduct . . . every

'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft

v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

There is no requirement that a case have been decided which is directly on point, "but existing

precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*,

563 U.S. at 741.

  In addition, qualified immunity protects state actors when it was objectively reasonable

for the state actor to believe that his conduct did not violate a clearly established right.

*Manganiello v. City of N. Y.,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might

not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017). Therefore, the district court may first ask whether it was objectively reasonable for any of the defendants to believe their conduct was not unlawful at the time. *Simpson v. City of N. Y.*, 793 F.3d 259, 268 (2d Cir. 2015). Qualified immunity does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Even if Plaintiff had plausibly alleged and established violations of his First Amendment rights, I find that Defendants are entitled to qualified immunity. As established by Supreme Court precedent, the First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime. *Mitchell*, 508 U.S. at 489. Moreover, at the time relevant to this action, neither the Supreme Court nor the Second Circuit had established a plausible First Amendment retaliation claim under similar circumstances involving prison officials' use of information from an interview with news media for the purpose of inmate Ad Seg status. Thus, given "the backdrop of the law at the time of the conduct," it was objectively reasonable for Defendants to believe that their conduct was not unlawful. *Kisela*, 138 S. Ct. at 1152; *see also Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) (Because no Second Circuit of Supreme Court precedent had put defendant prison officials on notice that inmate could not be punished for statements in an inmate's "letter to a third party expressing his desire for a woman later identified as a female correctional officer," defendants were entitled to qualified immunity).

As a result, in the alternative, I recommend that Plaintiff's Complaint be dismissed based on the doctrine of qualified immunity.

### C.    Whether Plaintiff Failed to Exhaust His Administrative Remedies

Although it appears that Plaintiff likely failed to exhaust his administrative remedies because he did not file a grievance related to his alleged retaliation claim here, Defendants failed to submit evidence supporting this contention in admissible form.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support . . . a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); Fed. R. Evid. 601 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Local Rules: N.D.N.Y. L.R. 56.1(a) ("The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. *It does not, however, include attorney's affidavits*.") (emphasis added); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'"); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) ("Attorneys' affidavits not based upon personal knowledge have been held not to comply with Rule 56(e) at least since *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950), a position this court has frequently reiterated . . . ."); *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) ("The first flaw in the granting of summary judgment to defendants in the present case was the court's reliance on the materials submitted by defendants as having

established the contents of the soaps provided to plaintiffs. The only affidavit submitted was that

of Cream, defendants' attorney. Cream, however, did not suggest that he had personal

knowledge of any of the facts he asserted."); *Stephenson Equip. v. ATS Specialized, Inc.*, 10-CV-

1517, 2013 WL 4508444, at *4 n.4 (N.D.N.Y. Aug. 23, 2013) (Suddaby, J.) (reminding

defendants that, "with regard to the attorney affidavit submitted in support of their motion [for

summary judgment] . . . , attorneys generally do not possess personal knowledge of the

underlying facts sufficient to render them competent to adduce an affidavit in support of a

summary judgment motion"); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark

Mgmt., Inc.*, 04-CV-2293, 2007 WL 74304, at *2 (E.D.N.Y. Jan. 8, 2007) ("[W]hen offering

business records in support of a motion for summary judgment, in order to avoid the bar against

hearsay, the offering party should present an affidavit from a document custodian that explain[s]

whether [the records] were kept in the ordinary course of business, although that person need not

have personal knowledge of the actual creation of the document.") (internal quotation marks and

citation omitted).  There is no indication before the Court that Assistant Attorney General

Pinsonnault possesses personal knowledge of the underlying facts sufficient to submit into

evidence the records of Plaintiff's grievance appeals to CORC.  (Dkt. No. 53, Attach. 3 at ¶ 7.)

   As a result, I recommend that, to the extent Plaintiff's Complaint is not dismissed

pursuant to this Report and Recommendation, the Court conduct an exhaustion hearing pursuant

to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011) to determine whether Plaintiff properly

exhausted his administrative remedies.

### D.    Whether Defendants O'Gorman, Gardner, Tomlin, and Smith Should be Dismissed for Lack of Personal Involvement

   "Personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under [section] 1983."  *Wright v. Smith*, 21 F.3d 496, 501

(2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991));

*McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). In order to prevail on a section 1983

cause of action against an individual, a plaintiff must show "a tangible connection between the

acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

"To be sufficient before the law, a complaint must state precisely who did what and how such

behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen*., 91-CV-8135, 1994 WL

23069, at *3 (S.D.N.Y. Jan. 24, 1994).

For the reasons stated in Defendants' memorandum of law, I recommend that, in the

alternative, Defendants O'Gorman, Gardner, Tomlin, and Smith be dismissed for lack of

personal involvement. *See Ward v. Lee*, 16-CV-1224, 2018 WL 4610682, at *11 (N.D.N.Y. July

3, 2018) (Hummel, M.J.) (finding that the affirmance of a disciplinary hearing as a mere "rubber-

stamp[]" does not amount to personal involvement for purposes of a claim pursuant to 42 U.S.C.

§ 1983); *Jean-Laurent v. Lane*, 11-CV-0186, 2016 WL 4775742, at *28 (N.D.N.Y. Aug. 18,

2016) (Dancks, M.J.) (subscribing to the "affirmance-plus standard, which holds that the mere

rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal

involvement."); *Scott v. Frederick*, 13-CV-0605, 2015 WL 127864, at *17 (N.D.N.Y. Jan. 8,

2015) (McAvoy, J.) (holding that allegations that Defendant Prack affirmed Defendant

Frederick's disciplinary determination, were insufficient to allege the personal involvement of

Defendant Prack).

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 53) be

**GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk of the Court shall provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: November 19, 2021
        Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge